# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOHN F. FERGUSON,

        Plaintiff,

        v.                       Case No. 06-C-325

WARDEN THOMAS BORGEN, JODINE DEPPISCH,
WARDEN LARRY JENKINS, JIM SCHWOCHERT,
MARK SCHOMISCH, LT. MAXWELL,
MELVIN PULVER, TOM GOZINSKE,
MATTHEW J. FRANK, SHERI HEINZ,
MICHELLE L. FRANCIS, and KENNETH LUEDTKE,

        Defendants.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (DOC. #51), DISMISSING DEFENDANTS DEPPISCH,
SCHWOCHERT, FRANK, JENKINS, BORGEN, SCHOMISCH, MAXWELL, PULVER,
AND GOZINSKE, GRANTING INSTANTER PLAINTIFF'S MOTION FOR EXTENSION
OF TIME (DOC. #86), AND DENYING PLAINTIFF'S MOTION TO STAY (DOC. #89)

        The defendants in this pro se civil rights action are seeking summary

judgment and an order dismissing the plaintiff-prisoner's retaliation and deliberate

indifference claims. Not surprisingly, the plaintiff, John F. Ferguson (Ferguson) opposes

the motion.

## STANDARD FOR SUMMARY JUDGMENT

        Summary judgment "shall be rendered forthwith if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986);

*McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute of "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings . . . "). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

2

## RELEVANT UNDISPUTED FACTS[1]

Plaintiff is a Wisconsin inmate who at all times relevant to this action was incarcerated at the Fox Lake Correctional Institution (FLCI). (DFOF ¶ 1.)

**A.    The Chronology of the Conduct Reports Giving Rise to Ferguson's Retaliation Claim**

On November 11, 2002, defendant Lieutenant Maxwell placed Ferguson in temporary lock-up (TLU) for allegedly violating Wisconsin Administrative Code §§ DOC 303.30 (Unauthorized Forms of Communication) and 303.31 (False Names and Titles). (Ferguson Aff. ¶ 2, Ex. 200). Ferguson denied knowledge of what was going on. *Id.*

On November 14, 2002, defendant Maxwell wrote conduct report #1401239 charging that Ferguson had violated four separate provisions from Wisconsin Administrative Code Chapter DOC 303. (DFOF ¶ 2.) The basic assertion in conduct report #1401239 was that Ferguson was attempting to scam Darlene Devine into sending $6,000 to the Post Office Box of Ferguson's brother and sister-in-law.[2] (DFOF ¶ 3.)

---

[1] Facts are taken from Defendants' Proposed Findings of Fact (DFOF) and the Affidavit of John Ferguson (Ferguson Aff.).

[2] Defendant Maxwell provided the following "Description of Incident":

Recently, I received information from a visitor that she believed another inmate, besides the one she visits, is attempting to extort her. During our conversation, this visitor stated she had received a type-written letter on November 04, 2002 with her boyfriend's return address. Contained in this letter was the following information and requests.

• "You know that I recently had my appeal denied by the courts, which had me feeling kind of down."
• "Anyway, a good friend of mine is here. His name is Mr. John and he's very good with the law. Me and him talked about my situation and I told him that the courts had denied me on my appeal. I asked him could he help me out. He said, 'Yeah.'"
• "And he also let me know that he charges $6,000 to do cases, which is very cheap."
• "Baby, I need for you to do this for me, badly. Mr. John already filed a motion and got me back in the appeal court, and the only thing

3

Ferguson's disciplinary hearing on conduct report #1401239 was held on December 3, 2002. (DFOF ¶ 4.) As a result of the proceeding, he was found not guilty of all offenses and conduct report #1401239 was dismissed. *Id.* The hearing officer's "Reason for Decision" states:

> Hearing officer relies on the statement from this offender as being credible. Offender Ferguson does not have a history of this behavior and it is possible that another offender could have done this. I have dealt with this offender in the past and he has been very credible. There is no evidence presented that states that this offender was positively identified. Hearing officer finds this offender not guilty of all charges.

(Ferguson Aff. ¶ 4, Ex. 202.) On December 3, 2002, Ferguson was released from segregation and returned to his housing unit. (Ferguson Aff. ¶ 5.)

---

that I gave him was my word that he would receive the $6000.00 for doing my case."

- "Now, we cannot speak about this in our letters, on the phone, or visits. I will let you know when the time is right. The reason why we can't speak about this because me and Mr. John can get in some serious trouble if they find out. Therefore, I will let you know when everything is final."
- "Here is what you do . . . . Go to the bank and get 6 - $1000.00 money orders, if you can get them from a bank. If not, go to a check cashing place and get them."
- Enclose them inside this letter and mail them to the address on the envelope."
- "Do not write anything on the money order, leave them blank. And do not get a tracer on them."

This letter was sent to me for review and possibly investigated for fraud. In reviewing this letter and contents I observed a stamp, self-addressed envelope to Mr. A. John - P.O. Box 342343 - Milwaukee, WI 53234. With this information I requested the postal inspector from this area to identify this Post Office Box. I was informed a few days later that the owner of this P.O. Box was Linda Holden, who is identified as a sister-in-law to Inmate Ferguson, John. It is also documented that Willie Anderson is another user of this P.O. Box. Willie Anderson is identified as Inmate Ferguson's brother on his visiting list. Attached to this conduct report is a copy of the letter sent to this lady and the visiting list of Inmate Ferguson, John #22168.

(Ferguson Aff. ¶ 3, Ex. 201.)

4

Defendant Maxwell then searched Ferguson's typewriter ribbon and discovered that his ribbon contained the addresses of both inmate Holloway and Darlene Devine and mentioned a "Mr. John" who, according to Ms. Devine's letter, was supposed to get paid for providing legal assistance.[3] (DFOF ¶ 5.) After discovering this new information, defendant Maxwell contacted legal counsel within the Department of Corrections to see if he could reissue a conduct report based on this new information.[4] (DFOF ¶ 6.) Maxwell was informed by legal counsel that a conduct report could be reissued under such circumstances.[5] (DFOF ¶ 7.)

On December 6, 2002, defendant Maxwell placed Ferguson in TLU pending further investigation of the alleged attempted theft. (DFOF ¶ 8.) On the Notice of Offender Placed in Temporary Lockup form, Ferguson wrote the following "Offender's Statement":

> On Dec. 3, 2002, I, John Ferguson, was found not guilty by Cpt. Pulver for the same alleged charge that Lt. Maxwell is placing me on TLU status for, along with other allegations. It's apparent that Lt. Maxwell, someone, has it out for me. And I should not be in the hole for something that I have no knowledge of. This will be my second time in the hole (unit 8) for the same offense, alleged offense! I want to talk to a captain or warden about this matter asap.

(Ferguson Aff. ¶ 8, Ex. 203.)

---

[3] Ferguson disputes this proposed fact, however, his dispute does not comply with the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"). As such, the proposed fact is deemed undisputed.

[4] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

[5] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

On December 17, 2002, Ferguson submitted an inmate complaint (FLCI-2002-43891), claiming, among other things, that defendant Maxwell retaliated against him by returning him to TLU for offenses for which he was previously found not guilty. (Ferguson Aff. ¶ 13, Ex. 205.) However, this inmate complaint was dismissed. (Ferguson Aff. ¶¶ 16, 18.)

On January 7, 2003, defendant Maxwell wrote conduct report #1402352. (DFOF ¶ 9.) Conduct report #1402352 set forth the same charges as conduct report #1401239, but the new conduct report added the information found on Ferguson's typewriter ribbon which was attached as evidence.[6] (DFOF ¶ 10.)

A disciplinary hearing on the new conduct report was held on January 23, 2003. Ferguson was found guilty of three of the four charges in conduct report #1402352. (DFOF ¶ 11.) Later that day, Ferguson appealed the decision to defendant Warden Thomas Borgen, who subsequently affirmed the disciplinary hearing officer's decision. (DFOF ¶¶ 12-13.)

On February 13, 2003, defendant Gozinske, the Inmate Complaint Examiner at FLCI, received Ferguson's inmate complaint regarding conduct report #1402352. (DFOF ¶ 14.) The inmate complaint asserts that procedural errors were committed in connection with this conduct report. *Id.* This inmate complaint, FLCI-2003-5569 contends that Ferguson should not have been issued two conduct reports for the same offense. *Id.* However, Gozinske recommended that the inmate complaint be dismissed. (DFOF ¶ 15.)

---

[6] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

Defendant Deputy Warden Larry Jenkins agreed with Gozinske's recommendation and dismissed Ferguson's inmate complaint. (DFOF ¶ 16.)

On February 20, 2003, Ferguson appealed the decision to the Corrections Complaint Examiner. (DFOF ¶ 17.) The Corrections Complaint Examiner and the Office of the Secretary found that issuance of the new conduct report violated Wis. Admin. Code § DOC 303.66(3) which states that the "institution shall issue only one conduct report for each act or transaction that is alleged to violate these sections." (DFOF ¶ 18; Gozinske Aff. ¶ 17, Ex. 108.) Because Ferguson was issued separate conduct reports for the same act, the Corrections Complaint Examiner and Office of the Secretary found that his due process rights were violated and ruled that conduct report #1402352 be expunged from Ferguson's record. (DFOF ¶ 19.) The final decision to affirm Ferguson's inmate complaint and expunge conduct report #1402352 was made by the Office of the Secretary on April 12, 2003. (DFOF ¶ 20.)

**B.      The Defendants' Roles in Ferguson's Retaliation Claim**

Defendant Jodine Deppisch is the warden of FLCI. (DFOF ¶ 21.) However, she was not employed at FLCI between November 2002 and April 2003. (DFOF ¶ 22.) Defendant Deppisch had no personal involvement in this matter. (DFOF ¶ 23.)

Defendant Schwochert was not employed at FLCI when Ferguson alleges that retaliation took place. (DFOF ¶ 24.) Defendant Schwochert had no personal involvement in this matter. (DFOF ¶ 25.)

Defendant Frank is employed by the State of Wisconsin as the Secretary of the Wisconsin Department of Corrections (DOC) and has held this position since January 6, 2003. (DFOF ¶ 26.) He did not personally participate in any decision to place Ferguson

in TLU. (DFOF ¶ 28.) Moreover, defendant Frank did not personally participate in any decision to write conduct report #1401239 or conduct report #1402352. (DFOF ¶ 29.) Further, defendant Frank did not personally participate or make any decision regarding whether Ferguson was guilty of any offense asserted in conduct report #1401239 or conduct report #1402352. (DFOF ¶ 30.)

Currently, defendant Maxwell is employed as a Captain at FLCI. (DFOF ¶ 32.) At all times relevant to this action, Maxwell was a Lieutenant at FLCI. (DFOF ¶ 33.) As a Lieutenant under the general supervision of the Corrections Security Director and the direct supervision of the Captain of an assigned shift, Maxwell was responsible for the control, discipline, and order of inmates at FLCI. (DFOF ¶ 34.)

Defendant Maxwell wrote conduct report #1401239 alleging that Ferguson was attempting to scam Darlene Devine into sending $6,000 to Ferguson's brother and sister-in-law's Post Office Box, after speaking with Devine on November 11, 2002. (DFOF ¶ 35.) Darlene Devine handed Maxwell a letter with her boyfriend's (Charles Holloway) return address.[7] (DFOF ¶ 36.) This letter instructed Devine to send six blank $1,000 money orders and to place them into an envelope addressed to Post Office Box 342343, Milwaukee, WI 53234.[8] (DFOF ¶ 37.) Devine approached Maxwell on November 11, 2002, because she had visited Holloway recently and he stated that he did not write that letter. (DFOF ¶ 38.) Maxwell then contacted the postal inspector who informed him that Post Office Box 342343 was owned and used by Ferguson's brother and sister-in-law. (DFOF ¶ 39.) Maxwell wrote conduct report #1401239 because he believed that Ferguson

---

[7] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

[8] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

was attempting to scam Devine out of $6,000 by pretending to be her boyfriend and making her believe that the $6,000 would provide him with legal assistance when in actuality the money was being sent to Ferguson's relatives. (DFOF ¶ 40.)

After Maxwell wrote conduct report #1402352 on January 7, 2003, he had no further involvement in the matter.[9] (DFOF ¶ 43.) Maxwell was not personally involved in any decision regarding Ferguson's guilt with respect to conduct report #1402352 nor was he personally involved in any decision regarding any of the appeals that Ferguson made after the disciplinary hearing where he was found guilty as charged in conduct report #1402352.[10] (DFOF ¶ 44.)

Defendant Gozinske is employed by the DOC as an Inmate Appeal Examiner at DOC headquarters, in Madison, Wisconsin. (DFOF ¶ 46.) At the times relevant to this lawsuit, he was an Institution Complaint Examiner at FLCI. *Id.* Gozinske worked in that capacity at FLCI from June 17, 1990, through November 25, 2006, and has been employed by the State of Wisconsin since August 8, 1977. *Id.* As an Inmate Complaint Examiner at FLCI, Gozinske had the duties and responsibilities defined in Wisconsin Administrative Code Chapter 310. (DFOF ¶ 47.) He investigated and processed inmate complaints, conducted other investigations as assigned, responded to correspondence as assigned, and monitored the climate of the institution. *Id.*

Defendant Gozinske became involved in this case on December 6, 2002, when he was asked to contact legal counsel at the DOC to see whether a conduct report

---

[9] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

[10] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

which was dismissed because of insufficient evidence could be rewritten if new evidence became available. (DFOF ¶ 48.) From the responses Gozinske received from legal counsel for the DOC, it was his understanding that a conduct report could be reissued but that the DOC did not condone doing so because it could be seen as abusive. (DFOF ¶ 49.)

On December 6, 2002, Ferguson appealed the hearing officer's decision respecting conduct report #1401239. (DFOF ¶ 50.) Although Ferguson was found not guilty of the offenses charged in this conduct report, he wanted the record corrected to show that he was found not guilty of Wis. Admin. Code. § DOC 303.34 (theft) instead of 303.43 (use of intoxicants) which was accidentally written on his conduct report. *Id.* Defendant Gozinske reviewed this appeal and on December 17, 2002, wrote a memo to Warden Borgen stating that the error was harmless and that the decision should be affirmed. (DFOF ¶ 51.) However, Gozinske also noted that he was aware that security wanted to rewrite this conduct report based on new evidence but that he did not believe FLCI should do so based on the e-mails he received from legal counsel. *Id.* Other than this memo, Gozinske was not involved in any decision regarding whether or not a conduct report should be reissued to Ferguson. (DFOF ¶ 52.)

Defendant Gozinske believes that conduct report #1402352, was issued to Ferguson on January 7, 2003, based on new evidence and that a disciplinary hearing on January 23, 2003, on the report was held and that Ferguson was found guilty of some of the charges. (DFOF ¶ 53.) Gozinske received Ferguson's inmate complaint, FLCI-2003-

5589,[11] regarding conduct report #1402352 on February 13, 2003. (DFOF ¶ 54.) The complaint alleged that procedural errors were committed in connection with this conduct report. *Id.* One of Ferguson's arguments was that he should not have been issued two conduct reports for the same offense. *Id.* Gozinske recommended that Ferguson's complaint be dismissed. (DFOF ¶ 56.) Deputy Warden Larry Jenkins agreed with Gozinske's recommendation and dismissed Ferguson's complaint. (DFOF ¶ 57.) Ferguson than appealed that decision to the Corrections Complaint Examiner, his appeal was affirmed and conduct report #1402352 was expunged from his record. (DFOF ¶ 58.)

Although defendant Gozinske expressed concerns about reissuing Ferguson a conduct report, he did not and does not believe that anyone at FLCI retaliated against Ferguson for challenging his conduct reports.[12] (DFOF ¶ 59.) Gozinske believes that Ferguson was reissued conduct report #1402352 because FLCI staff felt that there was substantial evidence implicating Ferguson in a serious fraudulent activity and legal counsel at DOC had stated that reissuance was allowable.[13] (DFOF ¶ 60.)

Defendant Pulver is a Supervising Officer 2 (Captain) at FLCI and was so employed at all times relevant to this case. (DFOF ¶ 61.) As a Captain, under the general supervision of the Corrections Security Director, Pulver is responsible for the security, custody, and control of inmates at FLCI. Pulver has responsibility for institution operations on an assigned shift and performs other related work as required. (DFOF ¶ 62.) On

---

[11] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e). In addition, it does not address the proposed fact.

[12] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

[13] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

11

December 3, 2002, Pulver dismissed Ferguson's conduct report #1401239, charging that Ferguson was attempting to scam an inmate's girlfriend into sending his brother and sister-in-law $6,000. (DFOF ¶ 63.) On January 23, 2003, Pulver found Ferguson guilty of three of the charges in conduct report #1402352. (DFOF ¶ 64.)

The additional evidence underlying conduct report #1402352 led defendant Pulver to believe that it was more likely than not that Ferguson committed the rule violations.[14] (DFOF ¶ 66.) Other than his role as the hearing officer for both of Ferguson's conduct reports, Pulver had no personal involvement in this matter.[15] (DFOF ¶ 67.) At no time did Pulver retaliate against Ferguson for challenging a conduct report and he does not believe that anyone at FLCI was retaliating against Ferguson for doing so.[16] (DFOF ¶ 70.)

Defendant Schomisch is employed by the DOC as a Corrections Security Director at FLCI. (DFOF ¶ 71.) At all times relevant to this lawsuit, Schomisch was employed by the DOC in this capacity. *Id.* As Security Director, under the general direction of the Warden, Schomisch administers and supervises the security program for FLCI. (DFOF ¶ 72.) He plans security program changes, directs the assignment of subordinate staff, and recommends security policy to the Warden. *Id.* Further, Schomisch assumes institution responsibility in the absence of the Warden. *Id.*

It is defendant Schomisch's understanding that legal counsel informed FLCI that reissuing a conduct report to Ferguson once it was learned that further evidence

---

[14] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

[15] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

[16] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

implicated him in the offenses was allowable under the circumstances.[17]  (DFOF ¶ 73.)
Schomisch reviewed Ferguson's TLU status on December 13 and December 20, 2002.
(DFOF ¶ 74.)  He decided that Ferguson should remain in TLU because further
investigation was required.  *Id.*

Defendant Jenkins is employed by the DOC as Warden at the Kettle Moraine
Correctional Institution (KMCI).  (DFOF ¶ 77.)  At all times relevant to this action, he was
a Deputy Warden at FLCI.  *Id.*  As Deputy Warden, under the direction of the Warden,
Jenkins helped develop, implement and administer the security, treatment and support
services for FLCI.  (DFOF ¶ 78.) He also provided the appropriate information to agencies,
the legislature and the public on institution development and operation.  *Id.*  It is Jenkins'
understanding that legal counsel informed FLCI that reissuing a conduct report to Ferguson
once it was learned that further evidence implicated him in the offenses was allowable
under the circumstances.[18]  (DFOF ¶ 79.)

On January 9, 2003, Ferguson wrote to Warden Borgen and Jenkins.  (DFOF
¶ 80.)  He claimed that the issuance of conduct report #1402352 was a form of "double
jeopardy, retaliation, and bigotry" because he was being issued two conduct reports for the
one incident.  *Id.*  Jenkins responded to this letter on January 17, 2003, stating that the
new conduct report was issued "due to new evidence presented and is in accordance with
provisions of the Wisconsin Administrative Code."  (DFOF ¶ 81.)  Jenkins made this

---

[17] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

[18] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

13

statement based upon his belief that DOC legal counsel had informed FLCI that reissuing a conduct report based on new evidence was acceptable.[19]  *Id.*

Defendant Borgen was employed by the DOC as Warden of FLCI from January 23, 2000, until January 7, 2005.  (DFOF ¶ 83.)  Warden Borgen's duties and responsibilities are generally defined by Wis. Stat. § 302.04 and as set forth in the Wisconsin Statutes and Wisconsin Administrative Code.  (DFOF ¶ 84.)  Among Borgen's duties as Warden, was responsibility for the overall operation and administration of the institution, including the formation of policies applicable to inmates.  *Id.*  It is Borgen's understanding that legal counsel informed FLCI that reissuing a conduct report to Ferguson once it was learned that further evidence implicated him in the offenses was allowable under the circumstances.[20]  (DFOF ¶ 85.)

An attempt by an inmate to extort money out of a civilian is considered to be a very serious offense and precautionary measures are taken to ensure that such allegations are investigated thoroughly.  (DFOF ¶ 88.)

## C.    Ferguson's Deliberate Indifference to a Serious Medical Need Claim

Ferguson contends that he had dental appointments scheduled on January 17, 2003, on February 28, 2003, on March 31, 2003, and on April 1, 2003, and that he was not seen by anyone or taken to the appointments.  (DFOF ¶ 90.)  At all times relevant to this action defendant Heinz was the Health Services Manager at FLCI.  (DFOF ¶ 91.)  His duties included management and supervision of health care services provided, developing

---

[19] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

[20] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

14

procedures, monitoring care plans, preparing required reports, and providing liaison activities to other disciplines, institution units, and community health care providers. (DFOF ¶ 92.) The Health Services Manager works with the primary care physician, dentist, psychiatrist and specialists serving as consultants to the Bureau of Health Services in a collaborative manner to provide quality health care at the assigned correctional facility in an efficient and effective manner. (DFOF ¶ 93.) While the primary care physician and dentist are responsible for the professional management of medical and dental services, it is the Health Services Manager who provides the overall administrative support and direction of the unit. (DFOF ¶ 94.) This position also monitors nursing practice documentation in medical records. (DFOF ¶ 95.) There is considerable latitude for independent action within established DOC/Division of Adult Institutions/Bureau of Health Services standards, policies and procedures. (DFOF ¶ 96.)

As the Health Services Manager, defendant Heinz was not made aware of every appointment that an inmate had. (DFOF ¶ 97.) Heinz would only be made aware of an inmate's missed dental appointments if someone had informed her. (DFOF ¶ 98.)

On April 7, 2003, defendant Heinz received an e-mail from Tom Gozinske, the Inmate Complaint Examiner at FLCI. (DFOF ¶ 99.) Gozinske's e-mail informed Heinz that Ferguson was complaining that the dental staff was doing nothing to eliminate his pain and suffering and that he had missed three dental appointments. Heinz forwarded this e-mail to defendant Michelle Francis, the dental assistant at FLCI, for a response. (DFOF ¶ 100.) At all times relevant to this action, defendant Francis was a dental assistant at FLCI. (DFOF ¶ 106.)

Defendant Dr. Luedtke is employed as a dentist at the Waupun Correctional Institution. (DFOF ¶ 107.) He has been employed in this capacity since October of 2003. *Id.* However, at all times relevant to this action, Luedtke was employed by the DOC as a dentist at FLCI. (DFOF ¶ 108.) In his capacity as a dentist, Luedtke's duties include examining and evaluating the dental conditions of all inmates upon admission to the institution and at periodic intervals thereafter. (DFOF ¶ 109.)

Defendants Francis and Luedtke have reviewed Ferguson's dental chart to answer his allegations. (DFOF ¶ 110.) The only documentation in the chart regarding the time frame from January 17, 2003, to June 2, 2003, is his "Diagnosis-Treatment" log. *Id.* On January 17, 2003, Dr. Luedtke made an entry in the log noting that Ferguson's Dental Service Request (DSR) complaining of a broken tooth in the upper right quadrant of his mouth had been received. (DFOF ¶ 111.) Dr. Luedtke also noted that he scheduled an appointment. (DFOF ¶ 112.) The dental services unit does not keep an appointment log book and DSRs are only kept in the chart for one year. (DFOF ¶ 113.) Therefore, it is impossible to determine the date that Ferguson's appointment was scheduled. *Id.*

On February 28, 2003, defendant Dr. Luedtke entered "x 2 above" on Ferguson's Diagnosis Treatment Log. (Exh. 113). (DFOF ¶ 114.) The entry means that the dental services unit had received another DSR from Ferguson on that date.[21] *Id.* On March 31, 2003, Dr. Luedtke entered "x 3 above" on the same log. (DFOF ¶ 115.) This entry also means that the dental services unit had received another DSR from Ferguson

---

[21] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

16

on that date.[22] *Id.*  That Ferguson had submitted three DSRs does not mean that he was scheduled appointments on those dates.[23]  (DFOF ¶ 116.)

On April 1, 2003, defendant Francis wrote "Pt in seg no transportation will schedule when out" pm Ferguson's Diagnosis-Treatment log.[24]  (DFOF ¶ 117.)  This entry signifies that Ferguson had a dental appointment scheduled for that day, but because he was in segregation, security was not able to provide transportation.  *Id.*  Francis noted that Ferguson's dental appointment would be rescheduled for when he got out of segregation. *Id*.

On April 6, 2003, Ferguson filed Offender Complaint FLCI-2003-12366 in which he stated:

> I informed HSU Dental Service Unit, via request form, that my teeth, upper & lower, gums as well, were causing me pain and discomfort whenever I ate or consumed liquids.  They (HSU) acknowledged my requests and made an appointment on these dates: 1-17-03, 2-28-03, and 3-31-03.
>
> Nothing has been done to eliminate my pain and suffering that I'm forced to endure, despite the fact, that I have written several requests and HSU medical I have not seen or been seen by a dentist at no point from my first (1-17-03) appointment until now.
>
> In this action, I seek medical attention immediately for dental care.

(Ferguson Aff. ¶ 71, Ex. 254.)

---

[22] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

[23] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

[24] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

On April 7, 2003, defendant Francis noted that Ferguson was questioning why it was taking so long and that she responded that an appointment would be made once the schedule allowed for it and security could provide an escort. (DFOF ¶ 120.) Francis made this entry because she had been forwarded an e-mail from Inmate Complaint Examiner Tom Gozinske asking her to reply to Ferguson's complaint that dental was doing nothing to eliminate his pain and suffering and that he had missed three dental appointments. (DFOF ¶ 121.) Francis replied that Ferguson had an appointment on April 1, 2003, but that he missed it because he was in segregation and security could not provide transportation. (DFOF ¶ 122.) Francis further stated that just because Ferguson had submitted three DSRs did not mean that he had been scheduled three different appointments. *Id.* Tom Gozinske followed up on this response and asked Francis what needed to be done to get Ferguson to dental since his April 1, 2003, appointment was cancelled. (DFOF ¶ 123.) Francis responded that Ferguson would have to wait for an appointment just like any other inmate. (DFOF ¶ 124.) Francis was not upset that Ferguson had filed an inmate complaint against the dental services unit.[25] (DFOF ¶ 125.) Her response was based on the dental services unit's practice. *Id.* If an inmate's dental appointment must be rescheduled, he will be put back on the list and must wait his turn for an appointment when the schedule allows. *Id.*

It is often difficult for inmates who are in segregation to keep their routine dental appointments because a two or three-man escort is required to transport the inmate

---

[25] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

from segregation and there often is not enough staff present to escort the inmate and maintain adequate staffing levels throughout the institution.[26] (DFOF ¶ 126.)

On June 2, 2003, Ferguson was seen by defendant Dr. Luedtke. (DFOF ¶ 127.) Dr. Luedtke noted that Ferguson complained of pain and sensitivity in tooth #2. (DFOF ¶ 128.) He ordered x-rays and noted that he would try a stainless steel crown to alleviate the pain and sensitivity. *Id.* Ferguson's tooth was not broken, nor did he have a serious cavity. (DFOF ¶ 129.) However, if Ferguson's tooth had been broken or if he had a cavity, Luedtke would have noted this in the chart.[27] *Id.* Luedtke did not see any diagnosable indication, such as a cavity, malformed tooth, or fractured tooth to explain why Ferguson was complaining of pain and sensitivity in tooth #2. (DFOF ¶ 130.) Dr. Luedtke also noted that Ferguson's pain and sensitivity might be due to a large sinus rather than any problem with the tooth.[28] (DFOF ¶ 131.) Additionally, Dr. Luedtke observed that a referral to "Dr. H" who is an oral surgeon, might be warranted if the crown failed. (DFOF ¶ 132.)

## ANALYSIS

The defendants contend that, 1) defendants Deppisch, Schwochert, and Frank should be dismissed from this case due to their lack of personal involvement; 2) defendants Jenkins, Borgen, Schomisch, Maxwell, Pulver, and Gozinske did not retaliate against Ferguson because he challenged conduct report #1401239; and 3) defendants

---

[26] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

[27] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

[28] Ferguson's "dispute" of this proposed fact does not comply with Rule 56(e).

19

Heinz, Francis, and Luedtke were not deliberately indifferent to a serious medical need of Ferguson.

**A.     Personal Involvement of defendants Schwochert, Deppisch, and Frank**

It is undisputed that defendants Schwochert and Deppisch were not employed at FLCI at any time relevant to this action and that they had no personal involvement with Ferguson's claims. Ferguson agrees that these defendants should be dismissed from this action. (*See* Ferguson's Statement of the Issues (Ferguson Brief) at 2.) Accordingly, the defendants' motion for summary judgment dismissing Schwochert and Deppisch will be granted.

However, Ferguson contends that defendant DOC Secretary Frank <u>was</u> personally involved in his retaliation claim. According to Ferguson, he informed Frank of defendant Maxwell's retaliation when he filed inmate complaint FLCI-2002-43891 and when he submitted a letter and documents to the Corrections Complaint Examiner with regard to that inmate complaint.

To recover damages under 42 U.S.C. § 1983, a plaintiff "must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). To be personally responsible, a defendant "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Johnson*, 444 F.3d at 583-84 (quoting *Gentry*, 65 F.3d at 561).

Defendant Frank has held the position of Secretary of the DOC since January 6, 2003. It is undisputed that Frank did not personally participate in any decision to place Ferguson in TLU; did not personally participate in any decision to write either conduct

report #1401239 or #1402352; and did not personally participate or make any decision regarding whether or not Ferguson was guilty of any offense in either conduct report. Moreover, the record reflects that the January 3, 2003, Office of the Secretary Report (OOS Report) accepting the decision of the Corrections Complaint Examiner to dismiss Ferguson's inmate complaint FLCI-2002-43891 was signed by Cindy O'Donnell, not Secretary Frank. (Ferguson Aff. ¶ 38, Ex. 218.) Indeed, Office of the Secretary involvement in this conduct report predates defendant Frank's tenure as Secretary of the DOC.

Ferguson has not shown that defendant Frank personally facilitated, approved, condoned, or turned a blind eye to the alleged retaliation. *See Vance v. Peters*, 97 F.3d 987, 994 (7th Cir. 1996). Thus, the defendants' motion for summary judgment with respect to the personal involvement of defendant Frank will be granted and Frank will be dismissed from this action.

**B.     Retaliation Claim**

A prison official who takes action in retaliation for a prisoner's exercise of a constitutional right may be liable to the prisoner for damages. *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996). Otherwise, lawful action "taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). Although it is easy to state a retaliation claim, *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) (petitioner need not allege a chronology of events from which retaliation could be plausibly inferred), the burden of proving the claim is heavy, *Babcock*, 102 F.3d at 275. Filing grievances in prison is constitutionally protected activity

sufficient to support a retaliation claim. *DeWalt*, 224 F.3d at 618; *Thomson v. Washington*, 362 F.3d 969, 970-71 (7th Cir. 2004).

To prevail on a retaliation claim, a prisoner must prove that his constitutionally protected conduct was a substantial or motivating factor in a defendant's actions. *Hasan v. United States Dep't of Labor*, 400 F.3d 1001, 1005-06 (7th Cir. 2005); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Spiegla v. Hull*, 371 F.3d 928, 941-42 (7th Cir. 2004). "A motivating factor is a factor that weighs in the defendant's decision to take the action complained of – in other words, it is a consideration present to his mind that favors, that pushes him toward, the action." *Hasan*, 400 F.3d at 1006. "Once the plaintiff proves that an improper purpose was a motivating factor, the burden shifts to the defendant . . . to prove by a preponderance of the evidence that the same actions would have occurred in the absence of the protected conduct." *Spiegla*, 371 F.3d at 943.

The defendants contend that Ferguson's conduct in challenging the first conduct report, #1401239, was not a substantial or motivating factor in the defendants' actions to issue the second conduct report, #1402352. Rather, according to the defendants, defendant Maxwell placed Ferguson in TLU and wrote conduct report #1402352 because he encountered new evidence further implicating Ferguson in the allegation that he was attempting to extort a female civilian out of $6,000; that this is considered to be a very serious offense and precautionary measure are taken to ensure that the matter can be thoroughly investigated; and that the FLCI defendants understood that legal counsel had informed them that reissuing a conduct report under these circumstances was allowable. The defendants recognize that they were mistaken in issuing conduct report #1402352 because it violated Wis. Admin. Code § DOC 303.66(3).

22

However, they assert that this mistake was corrected by the administrative process when conduct report #1402352 was expunged.

Ferguson, on the other hand, contends that defendants Maxwell, Schomisch, Jenkins, Pulver, Gozinske, and Borgen did retaliate against him because he challenged conduct report #1401239 and because he filed an inmate complaint. Ferguson asserts that the constitutionally protected activity he engaged in "was the right to challenge CR #1401239 and file inmate complaint of the defendants' actions against him before, during and after he was place[d] back in TLU status and before defendant Maxwell reissued CR #1402352 for the same exact allegations." (Response Brief at 3.) Ferguson asserts that defendant Maxwell committed the retaliatory act by returning him to TLU on December 6, 2002, and by issuing conduct report #1402352 on January 7, 2003.

According to Ferguson, there "is no dispute that Maxwell decided to retaliate against plaintiff when he found out that conduct report #1401239 was dismissed and plaintiff was released from segregation." *Id.* at 4. Ferguson challenges Maxwell's justification for placing him back in TLU and for issuing the new conduct report:

> Maxwell wants this court to believe that he found new evidence against the plaintiff that they had in there [sic] possession since 11-11-02, the same evidence that Pulver use[d] to find plaintiff not guilty in CR #1401239, and then contacted DOC legal counsel to see if another conduct report could be written against plaintiff based on this new evidence (a lie) which he never mentioned to anyone what the contents of this evidence revealed in order to establish DOC legal counsel's rational approval that a conduct could be reissued against plaintiff, nor did Maxwell establish this portion of a typing ribbon to belong to plaintiff. This lie that Maxwell informed all the other defendants with, influenced them to take actions against plaintiff to conspire with Maxwell in the violation of plaintiff's constitutional rights, and Pulver, Sc[h]omisch, Jenkins, Gozinske, Borgen, and Frank all where [sic] personally

> involved and made aware of Maxwell's retaliatory actions
> against plaintiff, but did nothing to stop it however; joined
> Maxwell. Maxwell's actions are by all means retaliatory and
> other named defendants that were influenced by his action[s]
> are liable for their actions as well. It's hard to believe that out
> of all the defendants that had knowledge of Maxwell's action,
> not one of them asked him "what did this allege[d] new
> evidence reveal" at the time that Maxwell alleged [to] have
> discovered it on 12-06-02?

*Id.*

The following facts of this case are undisputed. On November 11, 2002, defendant Maxwell placed Ferguson in TLU and wrote conduct report #1401239. On December 3, 2002, defendant Pulver found Ferguson not guilty of all offenses and conduct report #1401239 was dismissed. Ferguson was released from segregation and returned to his housing unit on the same day.

Defendant Maxwell then searched Ferguson's typewriter ribbon and discovered that his ribbon contained the addresses of both inmate Holloway and Darlene Devine and mentioned a "Mr. John" who, according to Ms. Devine's letter, was supposed to get paid for providing legal assistance. After discovering this new information, defendant Maxwell contacted legal counsel within the Department of Corrections to see if he could reissue a conduct report based on this new information. Maxwell was informed by legal counsel that a conduct report could be reissued under such circumstances.

On December 6, 2002, defendant Maxwell placed Ferguson in TLU pending further investigation of the alleged attempted theft. On December 17, 2002, Ferguson submitted an inmate complaint (FLCI-2002-43891), claiming, among other things, that defendant Maxwell retaliated against him by returning him to TLU for the second time for

an offense for which he was previously found not guilty. This inmate complaint was dismissed.

On January 7, 2003, defendant Maxwell wrote conduct report #1402352, which contained the same allegations as conduct report #1401239, plus information found on Ferguson's typewriter ribbon which was attached as evidence. On January 23, 2003, a disciplinary hearing was held where defendant Pulver found Ferguson guilty of three of the four charges set forth in conduct report #1402352. Ferguson appealed the January 23 decision to Warden Borgen. On February 3, 2003, Warden Borgen affirmed the disciplinary hearing officer's decision.

On February 13, 2003, defendant Gozinske received Ferguson's inmate complaint (FLCI-2003-5589) regarding conduct report #1402352, in which Ferguson alleged that procedural errors were committed on this conduct report. One of Ferguson's arguments was that he should not have been issued two conduct reports for the same offense. Gozinske recommended that Ferguson's inmate complaint be dismissed. Defendant Deputy Warden Larry Jenkins agreed with Gozinske's recommendation and dismissed Ferguson's complaint. However, following Ferguson's February 20, 2003, appeal, the Corrections Complaint Examiner and the Office of the Secretary found that reissuing Ferguson with the new conduct report based on the exact conduct violated Wis. Admin. Code § DOC 303.66(3) which states that the "institution shall issue only one conduct report for each act or transaction that is alleged to violate these sections." (Gozinske Aff. ¶ 17, Ex. 108.) Because Ferguson was issued two separate conduct reports for the same act, the Corrections Complaint Examiner and Office of the Secretary found that his due process rights had been violated and ruled that conduct report

#1402352 must be expunged from his record. The final decision to affirm Ferguson's complaint and expunge conduct report #1402352 was made by the Office of the Secretary on April 12, 2003.

Although Ferguson maintains that the defendants retaliated against him, there is no admissible evidence in the record to support this. Ferguson's opinion that the defendants retaliated against him is not sufficient to withstand summary judgment. *See* Fed. R. Civ. P. 56(e); *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). In short, Ferguson has not carried his burden with regard to his retaliation claim. Conclusory averments that he was retaliated against do not withstand summary judgment. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (citing *Patterson v. Chi. Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998)) ("It is well-settled that conclusory averments . . . without support in the record, do not create a triable issue of fact" ). Therefore, the defendants' motion for summary judgment with regard to Ferguson's retaliation claim will be granted.

## C. Deliberate Indifference to Serious Medical Need Claim

To establish liability under the Eighth Amendment, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). Factors that indicate a serious medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Gutierrez*, 111 F.3d at 1373 (citations omitted). A medical condition need not be life-threatening to qualify as serious and to support a § 1983 claim, providing the denial of medical care could result in further significant injury or in the unnecessary infliction of pain. *See Reed v. McBride*, 178 F.3d 849, 852-53 (7th Cir. 1999); *Gutierrez*, 111 F.3d at 1371.

A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Prison officials act with deliberate indifference when they act "intentionally or in a criminally reckless manner." *Tesch v. County of Green Lake*, 157 F.3d 465, 474 (7th Cir. 1998). Neither negligence nor even gross negligence is a sufficient basis for liability. *See Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991). A finding of deliberate indifference requires evidence "that the official was aware of the risk and consciously disregarded it nonetheless." *Chapman*, 241 F.3d at 845 (citing *Farmer*, 511 U.S. at 840-42).

The defendants contend that Ferguson did not have a serious medical need. In support of that contention, the defendants assert that, 1) Ferguson's tooth was not broken, he did not have a serious cavity, and Dr. Luedtke saw no diagnosable indication to explain why Ferguson was complaining of pain and sensitivity in his tooth; and 2) Ferguson was never scheduled for an urgent appointment, which are used for serious

dental needs and Dr. Luedtke never believed that Ferguson had a dental condition which could result in unnecessary pain if he was not immediately treated.

The defendants also contend that they were not deliberately indifferent to Ferguson's health. According to the defendants, Heinz' only involvement in this case came from an e-mail she received after Ferguson had filed an inmate grievance complaining that he had missed dental appointments and that dental services were doing nothing to eliminate his pain and suffering. Heinz forwarded this e-mail on to defendant Francis for a response and Heinz had no further involvement in this matter. The defendants contend that because Heinz assumed that Ferguson's dental needs were being treated appropriately and she never had any knowledge that Ferguson was being deprived of dental services for a serious dental need she could not have been deliberately indifferent to Ferguson's dental health.

The defendants contend that Ferguson's claims against defendants Francis and Luedtke also fail because at no time did either of them refuse to treat or make an appointment to see Ferguson for a serious dental need. The defendants go on to state:

> If Ferguson[] missed any dental appointments it was not because Francis or Luedtke refused to see him. If Ferguson missed multiple dental appointments (and the defendants are not making any such concession) – the most likely reason is that security was unable to provide the necessary manpower to escort Ferguson from segregation to the dental services unit. Further, because Ferguson was not scheduled for a urgent appointment after he missed his appointment on April 1, 2003, neither Francis nor Luedtke believed that Ferguson's dental needs were serious. Luedtke would have ensured that Ferguson received immediate dental services if he had been made aware of any facts leading him to believe that Ferguson had a serious dental need. Because neither Francis nor Luedtke ever knew of an excessive risk to Ferguson's dental health, they cannot be found to have been deliberately

28

indifferent.  Ferguson's Eighth Amendment claim must be dismissed.

(Defs.' Br. at 12) (citations omitted).

Ferguson's affidavit tells a different story.  According to Ferguson, on December 27, 2002, he submitted a Dental Service Request (DSR) to the HSU informing dental of the following:

> While eating some food my upper right back tooth broke and I have pieces of it and I have a big hole in my tooth.  I cannot eat or drink anything because the pain is to[o] extreme to bare [sic].  I need to see the dentist ASAP before this problem get worse.

(Ferguson Aff. ¶ 22.)  On January 17, 2003, a dental appointment was scheduled by defendants Luedtke and Francis to treat Ferguson's medical need for a broken tooth with a big hole in it, pain and suffering, lack of sleep, headaches, and not being able to properly eat and drink.  (Ferguson Aff. ¶ 37, Ex. 260.)  On that date, Ferguson was not taken to the Health Services Unit nor seen by dental staff, and was not provided with any reason why he was being denied medical care.

On February 21, 2003, Ferguson submitted another DSR to the Health Services Unit.  (Ferguson Aff. ¶ 63.)  Ferguson stated the following in his request:

> The pain that I am having in my upper right back tooth has gotten worse and I'm having the same problems as before.  I cannot eat or drink properly.  I'm not sleeping, due to the pain and discomfort.  I'm having bad headaches and I have lost weight.  I had an appointment for 1-17-03, but no one from HSU came to get me or came to view my conditions.  I need to see the dentist so he can treat my dental needs ASAP!  My upper right back tooth is broken with a hole in it!  I cannot come over to HSU on my own to get treatment, so what am I to do?

*Id.* On February 28, 2003, a dental appointment was scheduled to treat Ferguson's serious medical needs to relieve the pain and suffering. (Ferguson Aff. ¶ 66, Ex. 260.) Ferguson was not taken to dental nor seen by anyone and no explanation was given why he was not taken to dental to be cared for by the dentist, Luedtke, who made the appointment. *Id.*

On March 23, 2003, Ferguson wrote a one-page letter to defendant Heinz seeking assistance for a dental appointment and treatment of his broken upper right back tooth with a big hole in it, but he did not receive any response from Heinz. (Ferguson Aff. ¶ 67.) Ferguson's letter to Heinz states:

> I have had two (2) dental appointments (1-17-03 and 2-28-03) about this dental condition, but was not taken to HSU to see the dentist for treatment. I was not given any reasons why I was not taken to HSU to see the dentist on these days for medical treatment. And no one from HSU dental came seen [sic] me in Unit B Cell #27 concerning my dental medical needs. I need to go to the dentist before this condition gets worse!
>
> I have an extremely painful toothache in my upper right part of my mouth, which the tooth has a whole [sic] in it and is broken. I have had this pain for two months now, and it has gotten worse every day. Every time I close my mouth all the way, the pain shoots up into my head bringing water to my eyes. I cannot chew food at all and I have lost a lot of weight. Several officers and inmates have heard me complain[] about my tooth and observed my face swollen on the right side, whereas my eye was almost closed. I have blood and pus around my tooth, and I think it may be infected? It's very hard for me to do anything active, even sleeping I cannot do with this pain, I'm having numerous headaches also. I can only do so much to care for myself while in segregation (HU-8). Please, please, please let me see the dentist about this matter soon or have the dentist come see me to treat my condition! Thank you.

(Ferguson Aff. ¶ 67, Ex. 253.)

Ferguson submitted another DSR on March 25, 2003. (Ferguson Aff. ¶ 68.) On March 31, 2003, another dental appointment was scheduled by defendant Dr. Luedtke. (Ferguson Aff. ¶ 69.) However, Ferguson was not seen by anyone nor given an explanation why he was not taken to the Health Services Unit or why anyone from dental did not come view his condition. *Id.* On April 1, 2003, another dental appointment was scheduled for Ferguson to treat his serious medical need. (Ferguson Aff. ¶ 70.) Ferguson was not seen nor contacted by Health Services Unit staff as to why he was being denied medical treatment since his first appointment of January 17, 2003. *Id.* The pain and suffering, not being able to sleep or eat, and weight loss continued for Ferguson. *Id.*

On April 6, 2003, Ferguson submitted inmate complaint FLCI-2003-12366, in which he complained of denial of medical treatment, and which defendant Gozinske acknowledged on April 7. (Ferguson Aff. ¶ 71, Ex. 254.) On April 7, 2007, Gozinske e-mailed Heinz concerning Ferguson's denied appointments for dental treatment. (Ferguson Aff. ¶ 72, Ex. 255.) Heinz informed defendant Francis to respond to Gozinske's e-mail. *Id.*

On April 16, 2003, Gozinske recommended that inmate complaint FLCI-2003-12366 be affirmed in Ferguson's favor and that his dental appointment be expedited. (Ferguson Aff. ¶ 77, Ex. 258.) Gozinske included the following "Summary of Facts" in his ICE Report:

> According to Ms. Francis, inmate Ferguson had an appointment scheduled on 4/1/2003, but it was cancelled because he was in seg and no escort was immediately available. When asked what would need to be done to get him back to Dental, the response was "he needs to wait his turn just like everyone else here."

31

Since inmate Ferguson has been in seg since 12/6/2002 and his request slip showed he was in seg (so Dental should have anticipated this), he should not have to wait until his name comes to the top of the list to be seen again. Therefore, it is recommended this complaint be affirmed and Ferguson be given an expedited appointment.

*Id.* On April 22, 2003, James LaBelle affirmed the Inmate Complaint Examiner's recommendation for inmate complaint FLCI-2003-12366. (Ferguson Aff. ¶ 78, Ex. 259.)

There are factual disputes present concerning whether Ferguson had a serious medical need and whether defendants Heinz, Francis, and Luedtke were deliberately indifferent to that need. Specifically, the defendants characterize Ferguson's medical condition as a minor toothache. Ferguson, on the other hand, avers that he had a hole in his tooth which caused him great pain, and which prevented him from eating and sleeping. The record also shows that, according to Ferguson, he lost a significant amount of weight and that his face was swollen due to the problem with his tooth.

In addition, the defendants contend that their actions did not amount to deliberate indifference. They maintain that Ferguson missed one dental appointment and that he most likely missed that appointment because he was in segregation. The defendants further contend that no defendant was deliberately indifferent because they assumed that either Ferguson's dental needs were being taken care of or that he did not have a serious dental need. In contrast, Ferguson avers that he missed three dental appointments. According to Ferguson, he submitted his first DSR on December 27, 2002, his second on February 21, 2003, and his third on March 25, 2003. In addition, Ferguson avers that he wrote a letter to defendant Heinz on March 23, 2003, in which he expressed frustration over missed dental appointments and described his symptoms. Finally, on April

6, 2003, Ferguson submitted inmate complaint FLCI-2003-12366 complaining of denial of medical treatment. The ICE affirmed FLCI-2003-12366 on April 16, 2003, with a recommendation that Ferguson be given an expedited appointment. On June 2, 2003, Ferguson was seen by defendant Dr. Luedtke.

"[D]ental care is one of the most important medical needs of inmates." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (quoting *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980)). *See also Board v. Farnham*, 394 F.3d 469, 480-84 (7th Cir. 2005) (sheriff not entitled to qualified immunity on claim that he violated detainee's established constitutional right to receive adequate attention for a serious medical condition when he allegedly deprived inmate of toothpaste for over three weeks); *Manney v. Monroe*, 151 F. Supp. 2d 976, 989 (N.D. Ill. 2001) (genuine issues of material fact existed as to whether detainee's dental condition was sufficiently serious, whether the treatment he received was woefully inadequate, how many times he actually saw a dentist, how many times he had contact with a dental hygienist, and whether the hygienist exhibited deliberate indifference to his serious medical needs); *Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003) (deliberate indifference when inmate had only two teeth, causing severe gum soreness, swelling, and weight loss because prison doctor failed to complete and deliver medically necessary dentures for fifteen months despite knowledge of inmate's ongoing pain and medical problems); *Hunt v. Dental Dep't.*, 865 F.2d 198, 200-01 (9th Cir. 1989) (reversing grant of summary judgment for defendants, where inmate denied of his replacement dentures, suffered from breaking teeth, bleeding and infected gums, pain, and weight loss due to an inability to eat, demonstrated a serious dental need; *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (holding that a three week delay in sending dental care referral, with

33

knowledge of inmate's swollen and infected mouth and suffering, could support a finding of an Eighth Amendment violation).  In this case, a reasonable juror could infer that the defendants acted with deliberate indifference when Ferguson was not seen by a dentist, and received no medical dental care, for six months from the time that he first complained of "a big hole" in his tooth.  Hence,  the defendants' motion for summary judgment on Ferguson's Eighth Amendment claim will be denied.

## ADDITIONAL MATTER

On August 31, 2007, Ferguson filed a motion for extension of time.  He seeks twenty days to file a surreply to "bring up a very important reason[] to deny [the defendants'] request for summary judgment."  (Pl.'s Mot. for Extension of Time at 1.)  On September 13, 2007, Ferguson filed his motion to stay defendants' motion for summary judgment.   In support of this motion, he contends that the defendants' summary judgment motion did not provide him with the notice that they are required to give a *pro se* litigant.  *See* Civil L.R. 56.1(a) (E.D. Wis.).[29]  Specifically, Ferguson asserts that the defendants' motion does not

---

[29] **Civil L.R. 56.1 Summary Judgment Motions in Pro Se Litigation**

(a)      If a party is proceeding pro se in civil litigation, and the opposing party files a motion for summary judgment, counsel for the movant must comply with the following procedure:

(1)      The motion must include a short and plain statement that any factual assertion in the movant's affidavit(s) or other admissible documentary evidence will be accepted by the Court as being true unless the party unrepresented by counsel submits the party's own affidavit(s) or other admissible documentary evidence contradicting the factual assertion.

(2)      In addition to the foregoing statement, the text to Fed. R. Civ. P. 56(e) and (f), Civil L.R. 56.1, Civil L.R. 56.2, and Civil L.R. 7.1 must be part of the motion

34

contain the required notice statement or the text to Federal Rules of Civil Procedure 56(e) and (f).

Attached to Ferguson's brief and marked as Exhibit A is the defendants' motion for summary judgment that he asserts is deficient. However, this attachment contains the text to Rules 56(e) and (f) as well as the notice statement. Realizing the problem, Ferguson filed a letter asking the court to stay any decision in this case for a minimum of ten working days. The delay would enable Willie Anderson, the third party who mailed the August 31 motion to confirm that the defendants' summary judgment motion did not include pages 2-4, setting forth the test of F.R.Civ.P. 56(e) and 56(f), Civil Local Rules 56.1, 56.2 and 7.1. Fergusons' September 21 letter explains that his August 31 motion to stay was erroneous in that it contained documents that he received from the defendants on August 23, rather than the documents he received on February 4, 2007, with defendants' summary judgment motion.

Based on the foregoing, the court finds Ferguson provided sufficient reasons why he should be given an extension of time. On the other hand, the court is not persuaded that it should stay defendants' motion for summary judgment.

## CONCLUSION

In summary, the defendants' motion for summary judgment will be granted as to, 1) the personal involvement of defendants Deppisch, Schwochert, and Frank; and 2) the retaliation claim. The defendants' motion for summary judgment as to the Eighth Amendment claim will be denied.

Now, therefore,

**IT IS ORDERED** that the defendants' motion for summary judgment (Doc. #51) is **GRANTED IN PART AND DENIED IN PART** as described herein.

**IT IS FURTHER ORDERED** that defendants Deppisch, Schwochert, Frank, Jenkins, Borgen, Schomisch, Maxwell, Pulver, and Gozinske are dismissed from this action.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment is denied as to plaintiff's Eighth Amendment claim.

**IT IS FURTHER ORDERED** that the plaintiff's motion for extension of time (Doc. #86) is **GRANTED** instanter.

**IT IS FURTHER ORDERED** that the plaintiff's motion to stay defendants' motion for summary judgment (Doc. #89) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 24th day of September, 2007.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U.S. District Judge